UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LAMONT DEVORCE,

                              Petitioner,

        -v-

WILLIAM PHILIPS, Superintendent, Green Haven
Correctional Facility,

                              Respondent.

No. 04-CV-6155 (KMK) (MDF)

<u>ORDER ADOPTING REPORT
 AND RECOMMENDATION</u>

KENNETH M. KARAS, District Judge:

        Pro se Petitioner LaMont DeVorce ("Petitioner") filed this petition, seeking a writ of

habeas corpus ("Petition"), pursuant to 28 U.S.C. § 2254, challenging his conviction for criminal

possession of a weapon in the second degree, assault in the first degree, twelve counts of robbery

in the first degree, and two counts of attempted robbery in the first degree.  The case was

referred to Magistrate Judge Mark D. Fox for review, pursuant to 28 U.S.C. § 636(b), who issued

a thorough Report and Recommendation ("R&R"), concluding that this Court should deny the

Petition in all respects.[1]  Petitioner filed timely objections.  For the reasons stated herein, the

Court denies Petitioner's claims for relief and adopts the conclusions of the R&R.

I. Background

        The Court assumes the Parties' familiarity with the factual and procedural history of the

case, but will briefly summarize the facts most salient to the instant Petition.

--------

        [1] The case was initially assigned to Judge Colleen McMahon, who referred the matter to
Magistrate Judge Fox on August 13, 2004.  (Dkt. No. 2.)  The case was reassigned to this Court
on August 7, 2007.  (Dkt. No. 17.)

Petitioner was charged with two counts of attempted murder in the first degree, assault in the first degree, twelve counts of robbery in the first degree, two counts of attempted robbery in the first degree, six counts of robbery in the second degree, criminal possession of a weapon in the second degree, and criminal use of a weapon in the first degree, all in connection with an armed robbery at a restaurant in Pelham, New York.  (Trial Tr. 54–55, June 25, 1998 ("June 25 Tr.").)  The trial judge (Justice Barbara Zambelli) used the "jury box" system for jury selection, (*id.* at 25–26).  *See Sorto v. Herbert*, 497 F.3d 163, 167 (2d Cir. 2007) (describing box system).  Under this system, sixteen jurors were randomly called from the venire and interviewed by the judge, prosecutor, and defense attorneys.  The lawyers were given an opportunity to consent to dismissal, to challenge for cause, and, following the judge's ruling on the cause challenges, to exercise one or more of the twenty peremptory challenges afforded to each side.  *See* N.Y. Crim. Proc. Law § 270.25(2) ("Each party must be allowed the following number of peremptory challenges: (a) Twenty for the regular jurors if the highest crime charged is a class A felony, and two for each alternate juror to be selected."); *see also People v. Esquiled*, No. 8693-97, 2001 WL 1359533, at *4 n.7 (N.Y. Sup. Ct. Aug. 17, 2001) ("Attempted murder in the first degree is a Class A-I felony . . . .").  A new set of sixteen jurors was then brought into the box, and the process was repeated until a full jury was empaneled.  (June 25 Tr. 25–26.)

During round one of jury selection, sixteen prospective jurors were brought into the box.  Out of the sixteen, two were African American—Ms. Onyeneho and Ms. Godbold.[2]  Following interviews, two jurors were excused for cause, six were excused on consent of all parties, two

---

[2] Later in the voir dire, Ms. Onyeneho was referred to as "Ms. Nefro," (Trial Tr. 434, June 26, 1998 ("June 26 Tr.")), but this appears to have been error, as the clerk of the court called "Etholyn Onyeneho" to be seated in seat number one during round one of jury selection, (June 25 Tr. 60).

were struck peremptorily by the prosecution, four were struck peremptorily by the defense, and two were empaneled. (*See id.* at 147, 211, 214, 216–18.) Petitioner's counsel objected to the prosecution's peremptory strike of Ms. Godbold and requested a "*Batson* inquiry," joining Petitioner's codefendant's counsel's statement that there was no reason to strike Ms. Godbold "other than the fact that she's black."[3] (*Id.* at 216–17.) Justice Zambelli rejected the objection, stating that no pattern of discriminatory striking of jurors had been established. (*Id.* at 217.) The other African American prospective juror, Ms. Onyeneho, was empaneled on the jury, along with Ms. Sardone, a Caucasian female.[4] (June 26 Tr. 140.)

In the second round of jury selection, another sixteen prospective jurors were brought into the box. Two of the prospective jurors were African American—Ms. Smith and Mr. Browne. Four prospective jurors were excused on consent, two were struck peremptorily by the prosecution, seven were struck peremptorily by the defense, and three were empaneled as jurors, including Mr. Browne. (*See id.* at 123, 128, 133–38, 147–50.) The prosecution sought to

---

[3] Although Petitioner's co-defendant's counsel stated that Mr. Sears was also African American and objected to the prosecution's peremptory strike of Mr. Sears, the transcript makes clear that Mr. Sears was Caucasian. (June 26 Tr. 139 (stating that the prosecution's second round peremptory challenge was the "second African American" to be struck); *id.* at 435 (stating that Mr. Sears was a white male).)

[4] There is some confusion in the record. The transcript at the end of round one states that Justice Zambelli asked "Mr. Landman and Miss Sardone" to stay as selected jurors, (June 25 Tr. 219), but Justice Zambelli later stated that Ms. Onyeneho was selected as a juror, (June 26 Tr. 140). Although somewhat unclear, it appears that the defense actually peremptorily struck Mr. Landman from the panel. (June 25 Tr. 218.) In any event, it is clear from the Parties' submissions that Ms. Onyeneho was selected as a juror. (Resp't App. Ex. A, at 8 (stating, in Petitioner's brief to the Appellate Division, that Ms. Onyeneho was empaneled and was the jury foreperson); Decl. in Opp'n to Resp't's Aff. to Pet'r's Objection to Report of Magistrate ("Pet'r Decl. in Opp.") Ex. A (chart of jury listing Ms. Onyeneho as juror number one).)

exclude Ms. Smith for cause, noting that because "of the fact she's a Jehovah's Witness[,] . . . she had real concerns about sitting in judgment of someone, and would be very concerned about being wrong." (*Id.* at 124–25.) The court denied the application, (*id.* at 128), and the prosecution later used a peremptory challenge to strike Ms. Smith, (*id.* at 138). Petitioner's counsel objected, stating that she was the second African American to be struck and requesting an explanation. (*Id.* at 139–140.) The court clarified for the record that in each of the first two rounds of jury selection, two prospective African American jurors had been empaneled, one of whom was seated as a juror and one of whom was struck peremptorily by the prosecution. (*Id.* at 140–42.) The prosecutor stated that he believed Petitioner was alleging a systematic attempt to remove African Americans from the panel. (*Id.* at 141–42.) After the court asked the prosecutor if he would like to explain the peremptory challenges, the prosecutor stated that Ms. Godbold was struck, in part, because of her "religious reservations . . . as far as making a judgment," and because of the manner in which she answered the voir dire questions, including her "body language." (*Id.* at 143.) The prosecutor also noted his belief that Ms. Godbold had been a juror in a prior case that, in the prosecutor's view, had resulted in a "compromise verdict," where the defendant was convicted of only two misdemeanors. (*Id.* at 143–44.) The prosecutor further explained that Ms. Smith was struck because he believed, based on her answers during voir dire, and the manner in which she provided those answers, that she would have "difficulty sitting in judgment," and would have "considerable doubt in her mind about whether she was doing the right thing." (*Id.* at 144–45.)[5] Justice Zambelli then allowed counsel

---

[5] The prosecutor also noted that because Ms. Smith was a Mount Vernon resident, she either might know relatives of the trial defendants or otherwise be biased in their favor. (June 26 Tr. 145.)

for Petitioner and his co-defendants to be heard. Counsel for Petitioner dismissed as speculation the Mount Vernon connection of Ms. Smith, (*id.* at 145), while counsel for Petitioner's co-defendants objected to dismissal of "these people"—i.e., Godbold and Smith—based on their religion, (*id.* at 145–46). Justice Zambelli then stated that she interpreted the prosecution's basis for striking Ms. Smith to be that Smith was a Jehovah's Witness as much as to be "[Smith's] hesitation in balancing the respective issues," and that because the prosecution "offered a race-neutral reason," the *Batson* challenge was denied. (*Id.* at 146.)[6]

During the third round of selection, another sixteen prospective jurors were seated in the box. Three were African American—Ms. Lewis, Ms. Williams, and Ms. Simmons. Two prospective jurors were excused for cause, five were excused on consent, four were struck peremptorily by the prosecution, two were struck peremptorily by the defense, and four were selected, including Ms. Simmons. (*See id.* at 245–46, 274–75, 278, 282–84.) Ms. Lewis, who also was a Jehovah's Witness, was one of the five excluded on consent. (*Id.* at 245–46.) The prosecution used a peremptory challenge to strike Ms. Williams. (*Id.* at 278.) Petitioner's counsel objected that there was "a systemic exclusion of . . . African Americans," and that there "clearly seem[ed] to be a pattern." (*Id.* at 278–79.) Justice Zambelli rejected this *Batson* challenge, finding that Petitioner had failed to make out a prima facie showing, and stated that the motion could be renewed at a later time.[7] (*Id.* at 279.)

_____

[6] Justice Zambelli's ruling did not explicitly cover both Ms. Godbold and Ms. Smith, but it is a fair inference she intended the ruling to cover both, as her ruling followed the colloquy with counsel as to both jurors. However, the Court is willing to limit her ruling to Ms. Smith for present purposes.

[7] Petitioner's codefendant's counsel also objected to the prosecution's use of peremptory challenge to strike Ms. Karim, who counsel believed was an African American woman. (*Id.* at

In the fourth round of jury selection, all sixteen jurors seated in the box were white. Three were excused for cause, seven were excused on consent of all parties, three were struck peremptorily by the prosecution, two were struck peremptorily by the defense, and one was empaneled. (*See id.* at 417–20, 422–23, 455–60.) After defense counsel peremptorily struck a white juror, the prosecution raised a reverse *Batson* challenge, stating that the defense had "bounced seven out of eight white males between the ages of forty-five and fifty-five." (*Id.* at 423.) After reviewing the strikes in the previous rounds, Justice Zambelli found that the prosecution had established a prima facie case. (*Id.* at 446.) Defense counsel then offered race-neutral reasons for the strikes, which Justice Zambelli credited. She rejected the reverse *Batson* challenge, stating that defense counsel's reasons were not pretextual. (*Id.* at 453.) Jury selection continued for two subsequent rounds, but there is very little information about the races of the jurors in the fifth and sixth rounds. Petitioner submitted a handwritten chart showing that one out of the sixteen prospective jurors on the sixth panel, Mr. Sherman, was African American. (Pet'r Decl. in Opp. Ex. A, at unnumbered page 6.) Mr. Sherman was peremptorily challenged by the prosecution, (Trial Tr. 666, June 30, 1998), but was later selected as an alternate juror by agreement of all parties, (*id.* at 670–72). Petitioner's trial counsel did not renew the *Batson* challenge in the fourth, fifth, or sixth rounds of jury selection.

Following the jury trial in the New York County Court, Westchester County, Petitioner was convicted of criminal possession of a weapon in the second degree, assault in the first degree, twelve counts of robbery in the first degree, and two counts of attempted robbery in the

282–83.) However, Justice Zambelli concluded that Ms. Karim was of Indian descent, (*id.* at 283), and no further *Batson* challenge was raised with respect to Ms. Karim's strike.

first degree.  Petitioner was acquitted of the other charges.  Justice Zambelli sentenced Petitioner to concurrent maximum indeterminate terms of imprisonment of twelve and a half to twenty-five years for each of the robbery counts, six of which were to run consecutively with the maximum indeterminate terms of seven-and-a-half to fifteen years for the other charges.  (Resp't's Mem. of Law ("Resp't Mem.") 1–2.)

Petitioner thereafter engaged in lengthy appeal proceedings.  On direct appeal, Petitioner, through counsel, argued that:  (1) the trial court erred in denying Petitioner's challenges to prospective jurors; (2) the trial court erred in denying Petitioner's *Batson* challenges; (3) the "felony stop" of Petitioner's vehicle was unconstitutional; and (4) the trial court erred in denying Petitioner's motion to sever.  (Resp't App. Ex. A (Br. for Def.-Appellant), at iii.)  In an April 8, 2002 order, the Appellate Division affirmed the judgment, explaining in regard to Petitioner's *Batson* claim that Petitioner had "failed to make a prima facie showing that the People's peremptory strikes were racially motivated . . . .  Although he alleged that the People had established a pattern of striking black jurors, he failed to cite any other facts or circumstances to support his claim of racial bias."  *People v. Devorce*, 742 N.Y.S.2d 63, 64 (App. Div. 2002).  The Court of Appeals thereafter denied Petitioner leave to appeal on August 1, 2002.  *People v. Devorce*, 778 N.E.2d 557 (N.Y. 2002) (unpublished table decision).

Petitioner, proceeding pro se, then filed an application for a writ of error *coram nobis*, alleging ineffective assistance of appellate counsel for failing to argue that:  (1) the trial court erred when it did not order the prosecution to provide race-neutral reasons for the peremptory strikes; and (2) trial counsel was ineffective for failing to request such an order from the court.  (Resp't App. Ex. G, at 5.)  On November 10, 2003, the Appellate Division denied Petitioner's

application, *People v. Devorce*, 767 N.Y.S.2d 783 (App. Div. 2003), and the Court of Appeals

subsequently denied leave to appeal, *People v. Devorce*, 808 N.E.2d 1284 (N.Y. 2003)

(unpublished table decision). Petitioner then filed a motion with the New York Supreme Court,

Westchester County to vacate the judgment, pursuant to New York Criminal Procedure Law

§ 440.10, and to set aside the sentence, pursuant to New York Criminal Procedure Law § 440.20.

(Resp't App. Ex. K.) On July 13, 2004, Justice Zambelli denied Petitioner's motion, (*id.* Ex. N),

and on September 22, 2004, the Second Department denied leave to appeal, (*id.* Ex. Q).

On August 9, 2004, Petitioner filed the instant Petition pursuant to 28 U.S.C. § 2254.

(Dkt. No. 1.) Petitioner initially asserted three grounds for habeas relief: (1) ineffective

assistance of trial counsel for failure to request an accomplice instruction; (2) *Batson* violations;

and (3) ineffective assistance of appellate counsel. (Pet. unnumbered page 4.) However, in the

declaration accompanying the Petitioner's Memorandum of Law, (Dkt. No. 13), Petitioner stated

that he is pursuing only two grounds for habeas relief: "(1) [T]he trial court erred in denying his

*Batson* challenges; (2) appellate counsel was ineffective for failing to raise trial counsel's

ineffectiveness in not objecting to the court's defect of not ordering the prosecutor to give race-

neutral reasons for his strikes against African-American jurors." (Pet'r's Decl. ¶ 15; *see also*

Pet'r's Mem. of Law 1 (raising same two issues and not addressing trial counsel's failure to

request accomplice instruction).) Indeed, Petitioner expressly withdrew the other issues raised in

his Petition. (Pet'r's Decl. ¶ 16 ("[T]he remaining issues raised [in the Petition,] [are]

withdraw[n] . . . at this time.").) The Court thus will not consider Petitioner's claim regarding

the lack of an accomplice instruction.

In the R&R, Magistrate Judge Fox recommended that the Petition be denied.  (R&R 18.)

Petitioner submitted timely objections, (Objections to Magistrate's R&R ("Obj.")), arguing that

Magistrate Judge Fox erred in rejecting his *Batson* and ineffective assistance claims.  (*Id.*)

## II. Discussion

### A. Standard of Review

#### 1. Review of Magistrate Judge's Report & Recommendation

A district court reviewing a report and recommendation addressing a dispositive motion

"may accept, reject, or modify, in whole or in part, the findings or recommendations made by the

magistrate judge."  28 U.S.C. § 636(b)(1); *see also Donahue v. Global Home Loans & Fin., Inc.*,

No. 05-CV-8362, 2007 WL 831816, at *1 (S.D.N.Y. Mar. 15, 2007).  Under 28 U.S.C.

§ 636(b)(1) and Federal Rule of Civil Procedure 72(b), a party may submit objections to a

magistrate judge's report and recommendation.  The objections must be "specific" and "written,"

Fed. R. Civ. P. 72(b)(2), and must be made "[w]ithin 14 days after being served with a copy of

the recommended disposition."  *Id.*; *see also* 28 U.S.C. § 636(b)(1).

Where a party submits timely objections to a report and recommendation, as Petitioner

has here, the district court reviews de novo the parts of the report and recommendation to which

the party objected.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3); *Donahue*, 2007 WL

831816, at *1.  The district court "may adopt those portions of the . . . report [and

recommendation] to which no 'specific written objection' is made, as long as the factual and

legal bases supporting the findings and conclusions set forth in those sections are not clearly

erroneous or contrary to law."  *See Eisenberg v. New England Motor Freight, Inc.*, 564 F. Supp.

2d 224, 226 (S.D.N.Y. 2008) (quoting Fed. R. Civ. P. 72(b)(2)).

### 2. Review of Petition for Habeas Corpus Relief

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Thus, Petitioner is entitled to habeas corpus relief only if he can show that "the state court 'unreasonably' applied law as established by the Supreme Court in ruling on petitioner's claim, or made a decision that was 'contrary to it.'" *Cousin v. Bennett*, 511 F.3d 334, 337 (2d Cir. 2008) (quoting 28 U.S.C. § 2254(d)(1)). "While 'the precise method for distinguishing objectively unreasonable decisions from merely erroneous ones' is somewhat unclear, 'it is well-established in [the Second] Circuit that the "objectively unreasonable" standard of § 2254(d)(1) means that petitioner must identify some increment of incorrectness beyond error in order to obtain habeas relief.'" *Sorto*, 497 F.3d at 169 (brackets omitted) (quoting *Torres v. Berbary*, 340 F.3d 63, 69 (2d Cir. 2003)). The state court's determination of factual issues is presumed correct, and Petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Hoi Man Yung v. Walker*, 468 F.3d 169, 176 (2d Cir. 2006).

### 3. Review of Submissions by Pro Se Litigant

Pleadings submitted by pro se litigants are held to a less strict standard than those drafted by attorneys. *See Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 402 (2007) ("Even in the

formal litigation context, pro se litigants are held to a lesser pleading standard than other parties.").  Because Petitioner is proceeding pro se, the Court construes his pleadings to raise the strongest arguments that they suggest.  *See Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474–75 (2d Cir. 2006) (per curiam).

B. *Batson* Violation Claim

1. Governing Principles

The Supreme Court has held that the Equal Protection Clause of the Constitution prohibits prosecutors from exercising peremptory challenges against prospective jurors "solely on the basis of race."  *Cousin*, 511 F.3d at 337 (citing *Batson v. Kentucky*, 476 U.S. 79, 89 (1986)); *see also Richardson v. Greene*, 497 F.3d 212, 214 (2d Cir. 2007) ("[E]very person has a right to a trial before a jury impaneled without discrimination by race.").  In *Batson*, the Supreme Court articulated both a process and the standards by which a defendant may challenge potentially purposeful racial discrimination in a prosecutor's selection of jurors.  In particular, *Batson* sets out a three-step inquiry for trial judges.  First, the judge must determine whether the defendant has made a "prima facie" showing that the prosecutor exercised a peremptory challenge on the basis of race.  *See Batson*, 476 U.S. at 96–97; *see also Overton v. Newton*, 295 F.3d 270, 276 (2d Cir. 2002) ("[I]n order to establish a *prima facie* case of discrimination, a defendant must show facts and circumstances that raise an inference that the prosecutor used the peremptory challenge to exclude potential jurors from the petit jury on account of their race.").  Although the first-stage threshold is low, it is nevertheless a real hurdle:  "While litigants must now explain their motivations for certain strikes, courts must still be mindful of 'each side's historical prerogative to make a peremptory strike or challenge . . . without a reason stated,' if a

*prima facie* case of discrimination has not been established." *Sorto*, 497 F.3d at 170 (alteration

in original) (quoting *Miller-El v. Dretke*, 545 U.S. 231, 238 (2005)); *see also Guardino v.*

*Sabourin*, No. 11-CV-6906, 2012 WL 6013022, at *13–17 (S.D.N.Y. Dec. 3, 2012) (finding that

habeas petitioner had failed to make out prima facie case, following *Sorto*). In *Batson*, the

Supreme Court emphasized that "trial judges, experienced in supervising *voir dire*, will be able

to decide if the circumstances concerning the prosecutor's use of peremptory challenges create[]

a prima facie case of discrimination against black jurors." 476 U.S. at 97. In other words, the

trial judge must take account of "all relevant circumstances" in determining whether a prima

facie showing has been made. *Harris v. Kuhlmann*, 346 F.3d 330, 345 (2d Cir. 2003) (internal

quotation marks omitted). A prima facie case may be found, among other circumstances, when

"a pattern of strikes against black jurors included in the particular venire . . . give[s] rise to an

inference of discrimination," or when a "prosecutor's questions and statements during *voir dire*

examination and in exercising his challenges . . . support . . . an inference of discriminatory

purpose." *Batson*, 476 U.S. at 97 (internal quotation marks omitted).

     Second, if a defendant meets his or her burden of showing a prima facie case, "the burden

shifts to the State to come forward with a neutral explanation for challenging black jurors." *Id.*;

*see also McKinney v. Artuz*, 326 F.3d 87, 97–98 (2d Cir. 2003) (summarizing *Batson*'s burden-

shifting framework); *Rivers v. City of Rochester*, 856 F. Supp. 2d 620, 624 (W.D.N.Y. 2012)

(same). "Third, the court must then determine whether the defendant has carried his burden of

proving purposeful discrimination." *Rice v. Collins*, 546 U.S. 333, 338 (2006); *see also Rivers*,

856 F. Supp. 2d at 624 (same). Although the trial court should evaluate "the persuasiveness of

the justification" offered by the prosecution, "the ultimate burden of persuasion regarding racial

motivation rests with, and never shifts from, the opponent of the strike." *Purkett v. Elem*, 514

U.S. 765, 767–68 (1995) (per curiam); *see also United States v. Martinez*, 621 F.3d 101, 109 (2d

Cir. 2010) (same); *McKinney*, 326 F.3d at 98 ("Throughout the three *Batson* steps, the burden

remains with the moving party . . . .").

Invoking this protection under the Fourteenth Amendment, Petitioner challenges the

Appellate Division's determination that a prima facie case had not been established for the

prosecution's challenge of Ms. Godbold and Ms. Williams.  Petitioner also challenges Justice

Zambelli's rejection of his *Batson* challenge to the peremptory strike of Ms. Smith, arguing that

Justice Zambelli did not properly evaluate the credibility of the prosecution's race-neutral

explanation for the strike.[8]

### 2. Objections Regarding Whether Petitioner Established a Prima Facie Case

Petitioner argues that Justice Zambelli unreasonably applied *Batson* by finding that he

had not made out a prima facie case of racial discrimination, where the prosecutor had

peremptorily challenged Juror Godbold in round one and Juror Williams in round three.  (Pet'r

Decl. in Opp. ¶ 14; Pet'r Mem. 6–7, 14.)  Petitioner argues that he established a pattern of

discrimination and that "other," unspecified "relevant facts and circumstances," support an

inference of discrimination.  (Pet'r Decl. in Opp. ¶ 3; *see also* Obj. ¶¶ 7, 21.)

"[A] prima facie case of discrimination can be made out by offering a wide variety of

evidence, so long as the sum of the proffered facts gives rise to an inference of discriminatory

---

[8] "Where the highest state court to review the decision summarily affirms the Trial Court, the Federal Court must look to the Trial Court's treatment of peremptory strikes." *Rosario v. Burge*, 542 F. Supp. 2d 328, 340 n.6 (S.D.N.Y. 2008) (citing *Yist v. Nunnemaker*, 501 U.S. 797, 803 (1991); *Harris*, 346 F.3d at 345).

purpose." *Johnson v. California*, 545 U.S. 162, 169 (2005) (footnote and internal quotation marks omitted). When a litigant points to a potential pattern of discrimination, statistical evidence is a proper, important consideration for the court. *See United States v. Alvarado*, 923 F.2d 253, 255 (2d Cir. 1991) (noting that "statistical disparities are to be examined"). Indeed, "statistics, alone and without more, can, in appropriate circumstances, be sufficient to establish the requisite *prima facie* showing." *Overton*, 295 F.3d at 278; *see also Brown v. Alexander*, 543 F.3d 94, 101 (2d Cir. 2008) (same). However, the Second Circuit has noted that "[t]he need to examine statistical disparities may commend a wait-and-see approach," and that "an early *Batson* challenge limits the state court's ability to properly assess a *prima facie* case." *Sorto*, 497 F.3d at 170; *see also Brown*, 543 F.3d at 102 ("[A] state court does not act unreasonably where it denies a *Batson* challenge early in the jury selection process." (internal quotation marks omitted)); *Rosario v. Ercole*, 582 F. Supp. 2d 541, 556 (S.D.N.Y. 2008) ("*Brown* underscored the holdings of *Overton* and *Sorto*, and further illuminated the perils posed to a habeas court reviewing a Batson challenge lodged relatively early in the jury selection process. (internal quotation marks omitted)).

Courts have looked to two kinds of statistics in evaluating whether a criminal defendant has established a prima facie case. The first statistic, known as the "challenge rate" allows "discriminatory purpose [to be] be inferred when a party exercises a disproportionate share of its total peremptory strikes against members of a cognizable racial group compared to the percentage of that racial group in the venire." *Jones v. West*, 555 F.3d 90, 98 (2d Cir. 2009); *see also Alvarado*, 923 F.2d at 255–56 (considering difference between percentage of strikes used against minority venirepersons and the total percentage of the minority group in the venire). The

Second Circuit has made clear that "only a rate of minority challenges significantly higher than the minority percentage of the venire would support a statistical inference of discrimination." *Brown*, 543 F.3d at 101 (brackets and internal quotation marks omitted). In order for a court to properly assess the challenge rate, "the record should include, at a minimum, the number of peremptory challenges used against the racial group . . ., the number of peremptory challenges used in total, and the percentage of the venire that belongs to that racial group." *Jones*, 555 F.3d at 98; *see also Sorto*, 497 F.3d at 171–72 (noting that a properly developed factual record "would likely include" evidence of the "composition of the venire, the adversary's use of peremptory challenges, the race of the potential jurors stricken, and a clear indication as to which strikes were challenged" (footnote omitted)); *Guardino*, 2012 WL 6013022, at *14 (finding that state appellate court properly found no prima facie case after considering "the numerical assertions set forth by the defense," the corrected statistics, and the "baseline factual circumstances" related to the *Batson* challenge—i.e., the inadequate record regarding "the racial or gender composition of the remaining venire" and "other facts and circumstances" suggesting an inference of discrimination (internal quotation marks omitted)). Thus, if a defendant does not renew his or her claim once jury selection is completed, it is difficult to properly assess the statistical significance, because "the trial judge never confronts, and the trial record does not reveal, what the statistics would show at the conclusion of jury selection." *Sorto*, 497 F.3d at 170 (emphasis and brackets omitted) (quoting *Overton*, 295 F.3d at 279).

Courts have also looked to the "exclusion rate," a statistic that shows whether "a party uses peremptory challenges to strike a disproportionate number of a cognizable racial group from the venire." *Jones*, 555 F.3d at 98. "Cases involving successful challenges to exclusion

rates have typically included patterns in which members of the racial group are completely or almost completely excluded from participating on the jury." *Id.*; *see also Johnson*, 545 U.S. at 173 (holding that a prima facie case was established when all three African American prospective jurors were removed from the venire); *Batson*, 476 U.S. at 100 (holding that a prima facie case was established when all African American prospective jurors were removed from the venire). The Second Circuit has also noted that under *Batson*, "striking even a single juror for a discriminatory purpose is unconstitutional." *Walker v. Girdich*, 410 F.3d 120, 123 (2d Cir. 2005). Thus, while the "presence of one or more black jurors might tend to rebut an inference" of discrimination, *Brown*, 543 F.3d at 102 (internal quotation marks omitted), a party may not avoid "what appears to be a statistically significant pattern of racial peremptory challenges simply by forgoing the opportunity to use all of his challenges against minorities," *Jones*, 555 F.3d at 100 (emphasis and internal quotation marks omitted).

### a. Objection to Prosecution's Strike of Juror Godbold

Applying these principles, the Court finds that the state courts did not act unreasonably in finding that Petitioner had failed to establish a prima facie case of discrimination with respect to the strike of Juror Godbold. When the prosecution peremptorily struck Juror Godbold, the prosecution had used only two peremptory challenges, one against Juror Godbold and one against Juror Sears, a Caucasian male, and an African American juror had been seated on the jury. Thus, Petitioner has failed to show that the state courts acted unreasonably in finding that no pattern of discrimination existed, where the relevant *Batson* objection was made during the first round of jury selection and after the prosecution had used only two peremptory challenges, including one against a Caucasian male. *See id.* at 97 (holding that no prima facie case was

established when the prosecution "had used a peremptory challenge against only one of the two black members of the venire that had come up for consideration in the first round"); *see also Brown*, 543 F.3d at 102 (finding that a trial court's "wait-and-see approach" was not unreasonable when the *Batson* challenge was lodged "relatively early in the selection process"); *Sorto*, 497 F.3d at 170 (noting that, for habeas purposes, a state court does not act unreasonably in denying a *Batson* challenge "early in the jury selection process").[9]

Furthermore, neither defense counsel during voir dire nor Petitioner in this petition cited *any* other relevant circumstances, such as comments or questions by the prosecutor, which suggest racial discrimination. Contrary to defense counsel's claim that there was no reason to strike Juror Godbold other than because she was African American, Ms. Godbold stated during voir dire that she had difficulty judging other people, (June 25 Tr. 101, 188).[10] Indeed, during round two of jury selection, the prosecutor explained that Ms. Godbold was peremptorily struck

---

[9] Petitioner's argument that the Appellate Division's ruling—insofar as it involved finding that Petitioner had established a discriminatory pattern, but denying his motion because no other circumstances showed racial bias—was contrary to or unreasonably applied clearly established Supreme Court precedent also lacks merit. (Obj. ¶ 9 n.1.) Contrary to Petitioner's argument, the Appellate Division ruled that "although [Petitioner] *alleged*" a pattern of striking black jurors, he failed to cite "any other facts or circumstances" to support his claim. *Devorce*, 742 N.Y.S.2d at 64 (emphasis added). Thus, the Appellate Division did not find that Petitioner had succeeded in establishing a pattern of discrimination. Instead, the Appellate Division, properly applying *Batson*, found that, based on all relevant circumstances, Petitioner had failed to cite any facts or circumstances from which a pattern or other signs of discrimination could be inferred. *Id.*; *see Batson*, 476 U.S. at 97 (noting that a prima facie case may be established by evidence of a pattern of discrimination or by other evidence of discrimination); *see also Harris*, 346 F.3d at 345 (noting that a trial judge determining whether a prima facie case was established must take account of "all relevant circumstances" (internal quotation marks omitted)).

[10] Moreover, the prosecutor noted that Ms. Godbold described her service on a jury that, according to the prosecutor, had returned a compromise verdict. (June 26 Tr. 143–44.)

because of her "religious reservations . . . as far as making a judgment."[11]  (June 26 Tr. 143.)

Accordingly, the Appellate Division acted reasonably in dismissing Petitioner's *Batson*

argument when "neither the pattern of strikes nor anything in the prosecutor's recorded

statements provided any basis for a prima facie case of discrimination."  *Jones*, 555 F.3d at 97;

*see also Butler v. Fischer*, No. 02-CV-5733, 2008 WL 3338202, at *7 (S.D.N.Y. Aug. 8, 2008)

(holding that no prima facie case was established when the record provided a "sufficient basis

from [the prospective juror's] statements to undercut [p]etitioner's claim"), *aff'd,* 345 F. App'x

642 (2d Cir. 2009).

### b. Objection to Prosecutor's Strike of Juror Williams

For similar reasons, the Court finds that the state courts reasonably applied *Batson* in

finding that a prima facie case of discrimination was not established regarding the peremptory

strike of Juror Williams in the third round (of six) of voir dire.  When the prosecution

peremptorily struck Juror Williams along with two others, (June 26 Tr. 278), it was using its

third out of (thus-far) seven peremptory strikes to exclude a potential African American juror, or

---

[11] Generally, "[o]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot."  *Hernandez v. New York*, 500 U.S. 352, 359 (1991) (plurality opinion); *see also Ware v. Filion*, No. 04-CV-6784, 2007 WL 1771583, at *3 (S.D.N.Y. June 19, 2007) ("Where the prosecutor proffered an explanation for the peremptory challenge and the trial court . . . made a ruling on the prosecutor's racial motivation, the reviewing court does not rule on the sufficiency of the petitioner's *prima facie* showing.").  Here, although the prosecutor volunteered a race-neutral explanation for his strike of Juror Godbold later in jury selection, Justice Zambelli's ruling, as noted above, during round two was arguably confined to the prosecutor's strike of another juror, Ms. Smith.  As a result, the Court will assume that the preliminary issue of whether Petitioner established a prima facie case of discrimination regarding Juror Godbold is not moot.

a minority strike rate of 42.8%.[12]  Juror Williams was the fifth African American available for

peremptory strike out of twenty-six total persons in the venire to have been considered at that

point, which is a minority venire rate of 19.2%.  At the time of the strike, including this strike,

the prosecution had peremptorily struck three out of five African American venirepersons.  The

Court notes that the record is clear regarding the challenge rate and the percentage of minorities

on the venire at the time of the *Batson* challenge because, during the reverse-*Batson* challenge,

Justice Zambelli reviewed the races of the venire through the fourth round.  (June 26 Tr.

429–445.)  However, the record does not show what the statistics would have been at the end of

jury selection, because the races of the jurors in the fifth and sixth rounds of voir dire are mostly

unknown.

---

[12] When the Court refers to potential jurors or the "venire," it refers to only those jurors who were "called to the jury box and subject to evaluation and strike."  *Sorto*, 497 F.3d at 171 n.5.  Thus, jurors who were struck for cause or on consent of both parties are not considered part of the venire, because these jurors were never available for peremptory challenge.  *See id.*; *see also Butler*, 2008 WL 3338202, at *7 & n.9 (noting that jurors who were excused for cause were not included in the statistics calculations).  Here, Justice Zambelli often divided up the panel into groups of jurors, asking the prosecutor if he was peremptorily challenging any of the potential jurors within the group.  During the third round of voir dire, Justice Zambelli asked the prosecutor whether he was exercising any peremptory strikes against Jurors Horne, Williams, Campbell, Serina, Lamagra, or Duffy, having already removed five jurors from the third panel for cause or on consent.  (June 26 Tr. 274–78.)  The prosecutor responded by simultaneously striking Juror Williams, Juror Campbell, a Caucasian male, and Juror Duffy, another Caucasian male.  Because this information was available to Justice Zambelli at the time of the *Batson* challenge, the Court has included it in the statistical calculations.  The Court also notes that two other African Americans were initially seated on the third venire panel.  One of these venirepersons, Ms. Lewis, was removed from the jury on consent prior to the prosecution's use of peremptory challenges, (June 26 Tr. 245), and she has not been including in the statistics.  The other African American venireperson, Ms. Simmons, remained on the venire, but was not yet subject to peremptory challenge.  Accordingly, the Court also does not include Ms. Simmons in the statistical calculation, but it is worth noting that she was selected to serve as a juror.  (*Id.* at 284.)

Based solely on the statistics during the third round of jury selection, the strike of Ms. Williams presents a fair question as to whether Petitioner established a prima facie case. *See Alvarado*, 923 F.2d at 256 (stating, in a case on direct review from district court, that a "challenge rate nearly twice the likely minority percentage of the venire strongly supports a *prima facie* case "). But "it is one thing to conclude that a pattern of strikes is *prima facie* evidence of discrimination; it is a very different thing to hold that the contrary conclusion would be an unreasonable application of *Batson*." *Sorto*, 497 F.3d at 174; *see also Overton*, 295 F.3d at 277 ("'[A]n *unreasonable* application of federal law is different from an *incorrect* or *erroneous* application of federal law'" (emphasis in original) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000))). At the time of the strike, the prosecutor had used only seven of its twenty peremptory strikes, and only twenty-six jurors had been subject to peremptory challenge. After hearing argument, Justice Zambelli stated that although Petitioner had not provided enough evidence of a prima facie case for Juror Williams, "[i]t doesn't mean [the *Batson* challenge] can't be renewed at a later date." (June 26 Tr. 279.) When, as here, a trial court's decision "hinged primarily on the fact that [a] *Batson* challenge was lodged relatively early in the jury selection process," the trial judge "does not act unreasonably where it denies a *Batson* challenge." *Brown*, 543 F.3d at 97–98, 102 (holding that the state court reasonably denied a *Batson* challenge made after twenty prospective jurors were available for peremptory challenge, the prosecutor had exercised seven of eight peremptory challenges against African American venirepersons, and the state court judge noted that defense counsel could "renew the application later"); *Sorto*, 497 F.3d at 174 (holding that the trial court did not unreasonably reject a *Batson* challenge as premature after the prosecution had used six peremptory strikes); *Overton*,

295 F.3d at 279–80 (holding that the trial court did not unreasonably reject a *Batson* challenge as premature when the prosecution had used nine strikes).

Moreover, the significance of the statistical disparity here is undercut, because, despite his burden to "articulat[e] and develop[] the factual and legal grounds supporting his *Batson* challenge before the trial court," Petitioner did not "renew[] his claim once jury selection was completed." *Overton*, 295 F.3d at 279; *see also Rodriguez v. Greiner*, No. 01-CV-2161, 2004 WL 2781720, at *7 (S.D.N.Y. Dec. 3, 2004) ("The inadequacy of the record was only magnified by petitioner's failure to renew his claim at the completion of jury selection."). As a result, Justice Zambelli "never confronted, and the trial record does not reveal, what the statistics would have shown at the conclusion of jury selection." *Overton*, 295 F.3d at 279; *see also Rodriguez*, 2004 WL 2781720, at *7 (same). If Petitioner had renewed his challenge, Justice Zambelli would have been confronted with a complete record from which to evaluate whether the "statistics sufficiently established the inference that [the] challenges were based on race," and the "court could then have implemented the *Batson* process to ensure that impermissible challenges" were not allowed. *Overton*, 295 F.3d at 279; *see also Brown*, 543 F.3d at 103 (noting that because petitioner failed to renew the *Batson* challenge, "the status of jury selection at the time of the challenge did not insure that the statistics would establish a *prima facie* case irrespective of what happened during the jury selection process thereafter"). Accordingly, the Court finds that Justice Zambelli did not unreasonably apply federal law in concluding that Petitioner's *Batson* challenge was unsubstantiated and premature, when it was offered "midway in the [jury selection] process"— which process included three additional rounds of voir dire and a new jury pool. *Overton*, 295 F.3d at 280; *see also Collins v. Beaver*, No. 03-CV-0416, 2005

21

WL 1801603, at *6–7 (E.D.N.Y. July 27, 2005) (noting that even if the challenge rate was over two times higher than the likely percentage of minorities on the venire, the state courts reasonably denied the *Batson* challenge when the "applications did not include a complete picture of contrastable statistics and were made midway in the process" (internal quotation marks omitted)).

The Second Circuit has warned, however, that a failure fully to develop the trial record may not foreclose a *Batson* challenge based on a pattern of discrimination if the exclusion rate raises an inference of discrimination—i.e., if the prosecutor strikes all or nearly all of the members of a particular minority group. *See Jones*, 555 F.3d at 98–99 (noting that an inference of discrimination may arise from an exclusion rate and that "[i]nformation about the races of the remaining members of the venire . . . is not necessary"). But, here, the exclusion of three out of five African Americans does not rise to the level of "complete[] or almost complete[]" exclusion that often accompanies successful *Batson* challenges. *Id.* at 98; *see also Overton*, 295 F.3d at 274, 280 (holding that the trial court reasonably rejected a *Batson* challenge, even though the prosecutor had used seven of ten challenges against African Americans, including striking all five African American venirepersons in one round, and had excluded seventy percent of the African American jurors); *cf. Johnson*, 545 U.S. at 173 (holding that a prima facie case was established when all three prospective African American jurors were removed from the jury); *Green v. Travis*, 414 F.3d 288, 299 (2d Cir. 2005) (holding that a prima facie case was established when all African American jurors were peremptorily struck); *Harris*, 346 F.3d at 345–46 (holding that a prima facie case was established where all five prospective African American jurors were removed from the jury).

Additionally, just as with Juror Godbold, Petitioner does not point to any relevant circumstances, other than an alleged but unsubstantiated pattern, that might raise an inference of discrimination. During voir dire, defense counsel explicitly argued that the *Batson* challenge was based on a "systematic exclusion of . . . African Americans" and that "there clearly seems to be a pattern," without tendering any other facts to show discriminatory intent. (June 26 Tr. 278–79.) Nothing in the prosecutors' questions or comments supports an inference of discrimination. Furthermore, although Justice Zambelli had allowed the prosecutors to explain their strike of Ms. Godbold and Ms. Smith during round two of the voir dire, Justice Zambelli did not rule at that time that a pattern had been established, let alone that any pretextual reasons had been offered. *See Collins*, 2005 WL 1801603, at *8–10 (finding denial of *Batson* challenge in sixth round of jury selection reasonable, where, among other things, the state court judge reasonably found the prosecutor's race-neutral explanations for peremptory strikes in earlier voir dire rounds credible); *cf. Jones*, 555 F.3d at 100 (holding that the state court unreasonably found that no prima facie case was established when the judge had already found that the prosecutor's race-neutral explanation for striking another juror was pretextual). Accordingly, considering all relevant circumstances, the Court finds that the Appellate Division did not unreasonably uphold Justice Zambelli's denial of Petitioner's *Baston* challenge regarding Juror Williams.

### 3. Objection to the Prosecutor's Strike of Juror Smith

During the second round of jury selection, defense counsel objected to the prosecution's peremptory strike of Juror Smith. Although Justice Zambelli never explicitly ruled that Petitioner had established a prima facie case, she invited the prosecution to give an explanation

and ultimately denied Petitioner's challenge.[13]  Petitioner first argues that Justice Zambelli

unreasonably applied *Batson* by failing to complete the third step of the inquiry, when the

prosecutor peremptorily struck Juror Smith.  (Obj. ¶ 23; Pet'r Mem. 12–13.)

A trial judge has a "duty at the third stage [of the *Batson* inquiry] to determine the

credibility of the [non-moving party's] proffered [race-neutral] explanations."  *Messiah v.

Duncan*, 435 F.3d 186, 198 (2d Cir. 2006) (alterations in original) (quoting *Jordan v. Lefevre*,

206 F.3d 196, 200 (2d Cir. 2000)); *Frederick v. Rock*, No. 08-CV-11216, 2011 WL 2565754, at

*3 (S.D.N.Y. June 20, 2011) ("The last step of a *Batson* analysis requires the trial judge to assess

the credibility of the prosecutor's race-neutral reasons.").  This means that the trial judge must

"explicitly adjudicate the credibility" of the offered race-neutral explanation.  *Messiah*, 435 F.3d

at 198 (brackets and internal quotation marks omitted); *see also Galarza v. Keane*, 252 F.3d 630,

636 (2d Cir. 2001) ("We have repeatedly emphasized that a trial court may not deny a *Batson*

motion without determining whether it credits the race-neutral explanations for the challenged

peremptory strikes.").  However, a "judge need not engage in 'a talismanic recitation of specific

words in order to satisfy *Batson*.'"  *Messiah*, 435 F.3d at 198 (quoting *Galarza*, 252 F.3d at 640

n.10).  Indeed, in *Messiah*, the Second Circuit found that an "unambiguous rejection of a *Batson*

challenge will demonstrate with sufficient clarity that a trial court deems the movant to have

failed to carry his burden to show that the prosecutor's proffered race-neutral explanation is

pretextual."  *Id.*  The court noted that "[a]s long as a trial judge affords the parties a reasonable

---

[13] As with Juror Godbold, because the prosecutor offered a race-neutral explanation for
the peremptory challenge of Juror Smith, and because Justice Zambelli ruled on the ultimate
question of intentional discrimination, the preliminary issue of whether Petitioner established a
prima facie showing became moot.  *See supra* note 11.

opportunity to make their respective records," the judge may express a *Batson* ruling on the credibility of the race-neutral explanation in a "clear rejection or acceptance of a *Batson* challenge." *Id.*; *see also Frederick*, 2011 WL 2565754, at *3 (same). Applying these principles, the Second Circuit has found that the trial judge's statement of "[t]hat's five, five by the People," in reference to the five challenged strikes, was a "succinct but adequate *Batson* ruling" when the court had listened to defense counsel's arguments and unequivocally accepted all five strikes on the record. *Messiah*, 435 F.3d at 199.

However, the Second Circuit has also emphasized that a failure to rule on, or conduct a sufficient inquiry into, a *Batson* challenge does not satisfy the third step. *See Galarza*, 252 F.3d at 639–40 (holding that the trial court failed to complete *Batson*'s third step, where the court stated it was satisfied with the explanation for "at least three" out of five or six peremptory challenges, but did not rule on the credibility of the explanations for the remaining jurors); *Jordan*, 206 F.3d at 201 (holding that the third step of *Batson* was not satisfied when the trial court "resisted counsel's efforts to make argument regarding the peremptory strikes so as to create a full record"); *Barnes v. Anderson*, 202 F.3d 150, 157 (2d Cir. 1999) (holding that the trial court's statement "I won't rule on credibility of attorneys right now" was an "explicit refusal to rule on . . . credibility," which refusal did not satisfy "the court's duty under the third step of *Batson*"). And in *Dolphy v. Mantello*, 552 F.3d 236 (2d Cir. 2009), the Second Circuit found that the trial court unreasonably failed to make a credibility finding when: (1) the proffered basis for the strike "rested precariously on an intuited correlation between body fat and sympathy" for the defendant; (2) the "trial court's initial ruling was made without inquiry or finding, as though the ground for making the strike was self-evident;" and (3) the judge's second

ruling, in which he stated, "I'm satisfied that is a race neutral explanation, so the strike stands,"

"suggested that the proffer of a race-neutral explanation was itself enough," *id.* at 239. The

Second Circuit also emphasized that the trial judge quickly dismissed defense counsel's

argument that the prosecutor had seated other overweight jurors and that the "explanation

given . . . len[t] itself to pretext." *Id.*

The Court finds that this case fits within the parameters set forth in *Messiah* and is

factually distinguishable from *Dolphy*. After trial counsel for Petitioner made the *Batson*

challenge to the peremptory strike of Smith, the prosecutor explained, inter alia, that the strike

was "based upon her religious beliefs, her being a Jehovah's Witness, and based upon her

answers to questions that she's not comfortable in sitting in judgment of an individual . . . [and

that] she would have a considerable doubt in her mind about whether she was doing the right

thing." (June 26 Tr. 144.) The prosecutor also noted that because Ms. Smith was a Mount

Vernon resident, she might know relatives of Petitioner and his co-defendant and otherwise

might be sympathetic to "two fellow Mount Vernon residents." (*Id.* at 145.) After the

prosecution gave its explanation, Justice Zambelli asked defense counsel for their response. (*Id.*)

In response, counsel for Petitioner focused only on the Mount Vernon connection, arguing that

the court could not exclude everyone from Mount Vernon, and claiming that this reason was

pretextual. (*Id.*) Counsel for Petitioner's co-defendant, on the other hand, objected to striking

Ms. Smith based on her religion, suggesting that to do so would be in "violation of several

federal statutes to deprive people of their religious freedom and their right to serve on a jury."

(*Id.* at 146.) After allowing defense counsel to develop the record fully, Justice Zambelli stated:

"I didn't interpret the Jehovah's Witness as being a reason so much as maybe her hesitation in

balancing the respective issues at stake. That's what I hear coming from the District Attorney on this. They have offered a race-neutral reason, so the Batson challenge is denied." (*Id.* at 146.)

Based on the record, it is clear that Justice Zambelli "afford[ed] the parties a reasonable opportunity to make their respective records." *Messiah*, 435 F.3d at 198. She asked defense counsel for their responses and listened to their arguments on pretext. Her attentiveness supports a finding that she complied with her duty to weigh the credibility of the arguments during the third step of *Batson*. *See id.* at 199–200 (noting that the petitioner was not "prevented . . . from making a full record"); *see also Farino v. Ercole*, No. 07-CV-3592, 2009 WL 3232693, at *24 (E.D.N.Y. Sept. 30, 2009) (noting that the trial court satisfied *Batson* by hearing arguments from the lawyers and reviewing case law); *Moise v. Schultz*, No. 04-CV-2328, 2004 WL 2202665, at *5 (E.D.N.Y. Sept. 29, 2004) (noting that the trial court complied with *Batson*'s third step by "afford[ing] defense counsel time to counter the prosecutor's race neutral explanations"); *cf. Dolphy*, 552 F.3d at 239 (finding that the trial court failed to apply *Batson* properly where, the "court's initial ruling was made without inquiry or finding"); *Jordan*, 206 F.3d at 201 (finding *Batson* ruling inadequate, where the trial judge "resisted counsel's efforts to make arguments . . . so as to create a full record," and "granted counsel no time to identify the relevant facts and circumstances necessary to decide whether the race neutral reasons given were credible"); *Barnes*, 202 F.3d at 157 (finding *Batson* ruling inadequate, where, among other things, the trial judge explicitly refused to rule on credibility).

After allowing counsel to develop the record, Justice Zambelli repeated the prosecutor's arguments by stating that she "interpret[ed]" the prosecutor's explanation to be that Ms. Smith had trouble judging others, emphasizing that this explanation is "what [she] hear[d]." Justice

Zambelli's explanation of her own interpretation of the prosecutor's arguments supports a finding that she credited the explanation as a valid race-neutral reason for the strike. *See Farino*, 2009 WL 3232693, at *24 (recounting that the trial judge gave explanations for his *Batson* ruling); *cf. United States v. Thomas*, 320 F.3d 315, 320 (2d Cir. 2003) (noting that a trial judge may express a credibility finding by "confirm[ing] the accuracy of the prosecutor's explanation"). Justice Zambelli then complied with *Messiah* by clearly denying the *Batson* challenge. *See Messiah*, 435 F.3d at 200 (finding *Batson*'s third step satisfied when judge "ruled by clearly accepting the strike . . . after listening to the relevant arguments"); *McKinney*, 326 F.3d at 101 (holding that trial judge's statement "I see no reason why the juror should not be seated" was tantamount to a *Batson* decision, because "[b]y saying that it saw no reason for the Juror not to be seated, the court was saying that it found the defense's [proffered race-neutral] reason to be pretextual"); *cf. Galarza*, 252 F.3d at 639–40 (finding that *Batson*'s third step not satisfied when the trial court never ruled on two or three of the peremptory strikes); *Rose v. Senkowski*, No. 99-CV-6053, 2003 WL 21698240, at *7, *12 (E.D.N.Y. July 8, 2003) (finding that *Batson*'s third step was not satisfied when the judge refused to rule on *Batson* issue, stating "I'm not entertaining anything"). Although Justice Zambelli's statement that the prosecution "offered" a race-neutral explanation could be read as suggesting that she improperly considered the mere offering of the race-neutral explanation to be sufficient, when read in context with the explanation and with the Parties' arguments, her ruling credited, even if implicitly, the prosecution's explanation. *See Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams.*, No. 04-CV-10014, 2009 WL 3321047, at *3 (S.D.N.Y. Oct. 9, 2009) (holding, in a civil case, that the statement "[plaintiff] has offered a race-neutral rationale for the peremptory strikes" constituted

28

a third-step credibility finding under *Batson* when the court heard from both sides and took credibility into account); *see also Farino*, 2009 WL 3232693, at *24 (holding that the trial judge's analysis after hearing argument, when coupled with the statements "I think that is a race neutral explanation" and "[w]hen you analyze it . . . it would be race neutral," satisfied *Batson*); *Williams v. Duncan*, No. 03-CV-0568, 2007 WL 2177075, at *10 (N.D.N.Y. July 27, 2007) (finding that although the state court judge "did not articulate his rationale, it is implicit in his rejection of [p]etitioner's [*Batson*] motion that he had analyzed" the "credibility and demeanor of the attorney offering the race-neutral explanation"); *Moise*, 2004 WL 2202665, at *5 (holding that the trial court's denial of a *Batson* challenge, without explanation, satisfied the third step because a "general crediting of the prosecutor's race-neutral explanations satisfies *Batson*, and in appropriate circumstances the mere rejection of the claim may be sufficient" (internal quotation marks omitted)).[14]

Finally, the Court notes that this case is factually distinguishable from *Dolphy*, because the prosecutor's race-neutral explanation s here were not easily susceptible to pretext. To the contrary, the prosecution's explanation that Ms. Smith expressed reservations about judging is facially credible. *See Anderson v. Woods*, No. 07-CV-2180, 2008 WL 2440226, at *6 (S.D.N.Y. June 12, 2008) (finding that state court acted reasonably in accepting race-neutral explanation that the stricken juror had "admitted that his faith made it difficult for him to pass judgment on

_____

[14] The Court also notes that later in the voir dire, Justice Zambelli used the correct terminology during the reverse-*Batson* challenge. After listening to defense counsel's race- and gender-neutral explanations for peremptory strikes of white males, Justice Zambelli ruled that "[t]he Court is satisfied that this is not pretextual and, therefore, the *Batson* challenge is denied." (June 26 Tr. 453.) This ruling makes clear that Justice Zambelli was aware of her duty to determine credibility during the third step of *Batson*, and her earlier ruling should not be deemed unreasonable.

another human being"); *Welch v. Burge*, No. 03-CV-1423, 2007 WL 2028048, at *4, *6 (N.D.N.Y. July 12, 2007) (noting that the state court acted reasonably in accepting the prosecutor's explanation that the strike was based on the juror's "religious affiliation" and the fact that the stricken juror was unable "to look at [the prosecutor] when" he was "talking about . . . sitting impartial[ly]"). Moreover, as explained below, the prosecution's explanation was supported by the record.

Petitioner next argues that the state courts' rejection of the *Batson* challenge was unreasonable, because he "objects to the race-neutral reasons" given by the prosecutor. (Obj. ¶ 17.) A reviewing habeas court "ordinarily should give [the trial court's credibility] findings great deference." *Batson*, 476 U.S. at 98 n.21; *see also Rice*, 546 U.S. at 341–42 (noting that even if "[r]easonable minds reviewing the record might disagree about the prosecutor's credibility," a habeas court should not "supersede the trial court's credibility determination"); *Frederick*, 2011 WL 2565754, at *3 ("A court's acceptance of a prosecutor's proffered justification for a peremptory challenge is a factual determination and thus qualifies for the presumption of correctness under 28 U.S.C. § 2254(e)(1). Deference will be given to factual findings by both state trial and appellate courts." (brackets, citations, and internal quotation marks omitted)). Here, the Court finds that Justice Zambelli's credibility determination was reasonable, because the prosecution's proffered race-neutral explanations are amply supported by the record. During voir dire, Ms. Smith stated that she was "not very comfortable in sitting in judgment of another person" and that although she could "listen to evidence and act on it," she did not think it was her "prerogative to judge." (June 26 Tr. 43.) She also later stated that even though she could judge based on the evidence, she "would hate to have [her] judgment [be]

wrong and somebody [would] suffer because [she] misjudged a person." (*Id.* at 91.) The prosecution initially challenged Ms. Smith for cause, giving the same reasons that they later gave for the peremptory strike, namely that Ms. Smith said she was a Jehovah's Witness and would have trouble sitting in judgment. (*Id.* at 125.) Even though Justice Zambelli denied the for-cause challenge, she noted that Ms. Smith "may struggle." (*Id.* at 128.) After the prosecution used its peremptory challenge and gave the same race-neutral explanation, defense counsel objected to the reasons given, but provided little argument for why those reasons might be pretextual. (*See id.* at 144–45.) Based on this record, there is insufficient evidence to "compel the conclusion that the trial court had no permissible alternative but to reject the prosecutor's race-neutral justifications." *Rice*, 546 U.S. at 341; *see also Anderson*, 2008 WL 2440226, at *6 (finding that the state court acted reasonably in accepting a race-neutral explanation that the stricken juror "admitted that his faith made it difficult for him to pass judgment on another human being").[15]

---

[15] Petitioner also argues that the prosecution's peremptory strike of Ms. Smith was impermissibly based on religion. (Pet'r Decl. in Opp. ¶¶ 9–39; Obj. ¶ 17.) First, it is clear from the record that Justice Zambelli interpreted the prosecutors' reason to be primarily based on Ms. Smith's admitted difficulty sitting in judgment of others, not on her simply being a Jehovah's Witness. (June 26 Tr. 146.) Second, although the Second Circuit and other lower courts have extended *Batson*'s protections to include religious affiliation, *see, e.g.*, *United States v. Brown*, 352 F.3d 654, 668 (2d Cir. 2003), there is no clear Supreme Court precedent applying *Batson* to peremptory strikes based on religion, *see id.* at 666 ("The Supreme Court has not yet passed on whether religion-based peremptory challenges are unconstitutional."); *see also Miller-El*, 545 U.S. at 270 (J. Breyer concurring) (noting that the Supreme Court's decision in *J.E.B. v. Alabama*, 511 U.S. 127 (1994), extended *Batson* to gender-based claims, and that "[s]ome lower courts have extended *Batson*'s rule to religious affiliation as well"); *Davis v. Minnesota*, 511 U.S. 1115, 1115 (1994) (denying certiorari to appeal from Minnesota Supreme Court decision declining to extend *Batson* to religion). As a result, Petitioner's religion-based *Batson* claim cannot form the basis of a habeas petition, because the state court decisions were not "contrary to, [n]or involved an unreasonable application of" clearly established Supreme Court precedent. *See* 28 U.S.C. § 2254(d)(1); *Hodge v. Strange*, No. 00-CV-1881, 2005 WL 1018426, at *11 n.12

C. Ineffective Assistance of Counsel

Petitioner argues that he was denied effective assistance of appellate counsel, because his attorney did not argue that Justice Zambelli should have ordered the prosecution to give race-neutral reasons for striking Jurors Godbold and Williams or that trial counsel had provided constitutionally deficient counsel, based on trial counsel's failure to press Justice Zambelli to require race-neutral explanations.  (Obj. ¶ 28.)  A petitioner asserting ineffective assistance of counsel must show:  (1) that his attorney's performance fell below an "objective standard of reasonableness;" and (2) that the deficient performance prejudiced him so that a "reasonable probability" exists that "but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984); *United States v. Eyman*, 313 F.3d 741, 743 (2d Cir. 2002) (per curiam) (same).  Appellate counsel is "not required to raise every non-frivolous issue on appeal."  *Sellan v. Kuhlman*, 261 F.3d 303, 317 (2d Cir. 2001); *see also Smith v. Robbins*, 528 U.S. 259, 288 (2000) (noting that appellate counsel "need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal").  Indeed, the "process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy."  *Sellan*, 261 F.3d at 317 (internal quotation marks omitted).  Under AEDPA's deferential standard, the Court "must determine not whether the state court was incorrect or erroneous in rejecting [a

_____

(D. Conn. Apr. 29, 2005) (noting that it was "difficult to see how" a religion-based *Batson* claim "could be grounds for habeas relief because the United States Supreme Court has yet to pass on the issue").

petitioner's] ineffective assistance claim, but whether it was 'objectively unreasonable' in doing so." *Id.* at 315.[16] In other words, the Court must determine whether the Appellate Division unreasonably applied *Strickland* in denying Petitioner's ineffective assistance claim.

Petitioner's appellate counsel fully briefed the issue of Justice Zambelli's declining to find a prima facie case, arguing that a prima facie case was established for Jurors Godbold and Williams, and that "the prosecution never explained the race-neutral reasons," because "the trial court never allowed the defense to demonstrate a prima facie case." (Resp't App. Ex. A, at 27.) Accordingly, the Appellate Division did not unreasonably apply *Strickland*; after all, appellate counsel raised the very issue Petitioner alleges was omitted. *See Gaston v. Conway*, No. 06-CV-4365, 2008 WL 501339, at *11 (S.D.N.Y. Feb. 26, 2008) (denying ineffective assistance claim and noting that "appellate counsel raised and fully briefed the underlying *Brady* claim, though ultimately without success"), *adopted by* 2008 WL 1830755 (S.D.N.Y. Apr. 23, 2008). Furthermore, there was no prejudice to Petitioner from appellate counsel's apparent choice not to challenge the effectiveness of trial counsel in handling the *Batson* issue. In fact, trial counsel had raised timely *Baston* challenges as to Jurors Godbold and Williams, which were rejected by Justice Zambelli, and had preserved objections to Justice Zambelli's rulings. Based on this record, it does not appear that trial counsel was ineffective for failing to press the trial judge to change her ruling. *See Ponder v. Levine*, No. 00-CV-0649, 2004 WL 912868, at *2 (W.D.N.Y.

---

[16] AEDPA's deferential standard is triggered here, because Petitioner presented these ineffective assistance of counsel claims to the Appellate Division in his writ of error *coram nobis* petition. (*See* Resp't App. Ex. G.) The Appellate Division denied the claim on the merits by stating that petitioner "failed to establish that he was denied the effective assistance of appellate counsel," (*id.* Ex. I). *See Sellan*, 261 F.3d at 312, 314 (holding that the state court decided petitioner's claim on the merits by rejecting his *coram nobis* motion by stating that petitioner's "ineffective assistance of counsel claim" was "denied" (internal quotation marks omitted)).

Apr. 26, 2004) (rejecting petitioner's ineffective assistance claim when, inter alia, trial counsel objected to admission of certain testimony).[17]  Thus, appellate counsel's decision not to include a weak ineffective assistance claim does not fall below an objective standard of reasonableness. *See Gee v. Conway*, 664 F. Supp. 2d 225, 233 (W.D.N.Y. 2009) (noting that appellate counsel cannot be faulted for failing to raise an ineffective assistance claim when the petitioner could not "establish that his trial counsel was ineffective" (internal quotation marks omitted)); *Talbert v. Conway*, No. 05-CV-1079, 2008 WL 4722094, at *7 (E.D.N.Y. Oct. 21, 2008) (holding that the state court did not unreasonably apply *Strickland* in rejecting allegation that appellate counsel had ineffectively failed to raise claims, which claims appellate counsel deemed meritless); *Jelinek v. Costello*, 247 F. Supp. 2d 212, 289 (E.D.N.Y. 2003) ("Because trial counsel cannot be deemed ineffective, appellate counsel could not be deemed ineffective for failing to raise this claim on direct appeal.").   Accordingly, the Court cannot say that it was an unreasonable application of *Strickland* for the Appellate Division to reject Petitioner's ineffective assistance of appellate counsel claim.[18]

---

[17] The Court notes that although trial counsel's failure to re-raise the *Batson* claim at the end of jury selection affected the Court's statistical analysis, the Court cannot conclude based on the record that such a failure was objectively unreasonable.  By the end of jury selection, trial counsel may have decided that Petitioner's *Batson* claim lacked merit.  *See Williams*, 2007 WL 2177075, at *21 (declining to find trial counsel ineffective where it was possible that counsel "recognized the futility of the *Batson* challenge").

[18] In a letter dated May 29, 2012, Petitioner requested permission to amend the Petition to assert an unspecified jurisdictional defect.  Petitioner has not clarified this request or otherwise submitted any new claims to the Court.  If Petitioner seeks to file a new petition pursuant to 28 U.S.C. § 2254, he should direct the Court to authority permitting him to do so.  For now, however, the Court has found Petitioner's claims to be without merit, and, without further guidance, sees no basis to grant Petitioner leave to amend to add a new claim.

## III. Conclusion

Having reviewed de novo the issues raised in Petitioner's objections, the Court adopts the conclusions of the R&R and denies the Petition. For the reasons stated herein and in the R&R, the Court finds that Petitioner's claims do not warrant habeas relief. A certificate of appealability will issue only as to Petitioner's *Batson* challenge to the peremptory strikes of Jurors Smith and Williams. Petitioner is granted leave to pursue that appeal *in forma pauperis*. Accordingly, it is hereby

ORDERED that the Petition is dismissed with prejudice; and it is further

ORDERED that a Certificate of Appealability is granted only with respect to issues of Petitioner's *Batson* claim regarding Jurors Smith and Williams; and it is further

ORDERED that Petitioner is granted leave to pursue that appeal *in forma pauperis.*

The Clerk of the Court is respectfully directed to close this case.

SO ORDERED.

Dated:          August ____, 2013
               White Plains, New York

_____
KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

<u>Service List</u>

For Mailing by Clerk's Office:

Lamont Devorce
(98-A-6535)
Green Haven Correctional Facility
P.O. Box 4000
Stormville, NY  12582-0010

John James Sergi, Esq.
Joseph M. Latino, Esq.
Westchester County District Attorney
111 Dr. Martin Luther King, Jr. Blvd.
White Plains, NY 10552

## III. Conclusion

Having reviewed de novo the issues raised in Petitioner's objections, the Court adopts the
conclusions of the R&R and denies the Petition. For the reasons stated herein and in the R&R,
the Court finds that Petitioner's claims do not warrant habeas relief. A certificate of
appealability will issue only as to Petitioner's *Batson* challenge to the peremptory strikes of
Jurors Smith and Williams. Petitioner is granted leave to pursue that appeal *in forma pauperis*.
Accordingly, it is hereby

ORDERED that the Petition is dismissed with prejudice; and it is further

ORDERED that a Certificate of Appealability is granted only with respect to issues of

Petitioner's *Batson* claim regarding Jurors Smith and Williams; and it is further

ORDERED that Petitioner is granted leave to pursue that appeal *in forma pauperis.*

The Clerk of the Court is respectfully directed to close this case.

SO ORDERED.

Dated:      August 6, 2013
            White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

Service List

For Mailing by Clerk's Office:

Lamont Devorce
(98-A-6535)
Green Haven Correctional Facility
P.O. Box 4000
Stormville, NY 12582-0010

John James Sergi, Esq.
Joseph M. Latino, Esq.
Westchester County District Attorney
111 Dr. Martin Luther King, Jr. Blvd.
White Plains, NY 10552